# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **HAVEN B. MCCRAY,** ) | |
| Plaintiff ) | |
| ) | Civil Action No. 2:22cv00007 |
| v. ) | |
| ) | **REPORT AND RECOMMENDATION** |
| **KILOLO KIJAKAZI,** ) | |
| **Acting Commissioner of** ) | By: PAMELA MEADE SARGENT |
| **Social Security,** ) | United States Magistrate Judge |
| Defendant ) | |

*I. Background and Standard of Review*

Plaintiff, Haven B. McCray, ("McCray"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 1381 *et seq*. Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that McCray protectively filed her application for SSI[1] on November 5, 2019, alleging disability as of October 6, 2018, based on anxiety; social disorder; depression; and anger issues. (Record, ("R."), at 15, 192.) The claim was denied initially and on reconsideration. (R. at 86-107.) McCray requested a hearing before an administrative law judge, ("ALJ"). (R. at 108.) A hearing was held on February 9, 2021, at which McCray was represented by counsel. (R. at 29-42.)

---

[1] On April 4, 2016, McCray protectively filed an application for SSI, alleging disability as of August 15, 2013. (R. at 46.) By decision dated October 11, 2018, the ALJ denied McCray's claim. (R. at 46-53.) It does not appear that McCray appealed that decision.

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("A.R."), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). It is noted that, when *Albright* was decided, the agency "weighed" opinion evidence under different standards. *See* 56 Fed. Reg. 36932-01, at *36960, 1991 WL 142361 (Aug. 1, 1991). Those standards have been superseded by 20 C.F.R. § 416.920c, which prescribes how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright. See* Program Operations Manual System, ("POMS"), DI 24503.005, available at https://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 13, 2021) (explaining the categories of evidence).

Here, the ALJ noted the ALJ's October 2018 finding that McCray's affective and anxiety disorders were severe. (R. at 22.) He found this finding to be persuasive. (R. at 22.) The ALJ found the medical evidence did not support a determination of disability because it did not contain any mental health hospitalizations, intensive inpatient/outpatient treatment or evidence of the need for a supportive mental environment. (R. at 22.) In addition, the ALJ found McCray was able to engage in mental health therapy sessions and perform her own personal care needs. (R. at 22.)

By decision dated March 17, 2021, the ALJ denied McCray's claim. (R. at 15-24.) The ALJ found McCray had not engaged in substantial gainful activity since November 5, 2019, the application date. (R. at 17.) The ALJ determined McCray had severe impairments, namely, generalized anxiety disorder; borderline intellectual functioning; and major depressive disorder, but he found McCray did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.)

The ALJ found McCray had the residual functional capacity to perform light[2] work, except she was limited to simple, routine work with no complex instructions, procedures or processes; she required a stable, low-stress work environment with few changes and free of timed performance demands; she could occasionally interact with co-workers or supervisors; and she could only have infrequent (less than occasional) interaction with the public. (R. at 20.) The ALJ found McCray was unable to perform any past relevant work. (R. at 22.) Based on McCray's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that McCray could perform, including the jobs of a bench assembler, a cleaner-housekeeper and an office helper. (R. at 23, 39-40.) Thus, the ALJ concluded McCray was not under a disability as defined by the Act and was not eligible for SSI benefits. (R. at 24.) *See* 20 C.F.R. § 416.920(g) (2022).

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2022).

After the ALJ issued his decision, McCray pursued her administrative appeals, (R. at 241-43), but the Appeals Council denied her request for review. (R. at 1-5.) McCray then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2022). This case is before this court on McCray's motion for summary judgment filed October 18, 2022, and the Commissioner's motion for summary judgment filed December 22, 2022.

## II. Facts[3]

McCray was born in 1993, (R. at 23), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). She has a high school education and has past relevant work experience as a cook's helper and an information clerk. (R. at 39, 193.) McCray testified that she was unable to work due to panic attacks, being nervous and difficulty controlling her anger. (R. at 37.) She stated she took Wellbutrin for her anxiety, but it did not help her symptoms.[4] (R. at 38.) McCray reported that, approximately two to three years after she graduated from high school, she started experiencing depression and anxiety. (R. at 335.) She reported not wanting to do anything, feeling very sad, "getting worried," "thinking about things constantly," difficulty focusing and moodiness. (R. at 335.) McCray reported going out with

---

[3] On appeal, McCray's argument centers around the ALJ's findings related to her mental residual functional capacity. Therefore, the court will limit its discussion to those facts relevant to McCray's mental impairments and accompanying limitations. As noted above, a prior decision was issued on October 11, 2018. Therefore, the court will limit its discussion to the evidence beginning October 12, 2018, the day after the ALJ's prior decision, to March 17, 2021, the date of the ALJ's current decision.

[4] On January 20, 2018, McCray was prescribed Wellbutrin and, as discussed in the medical summary of this Report and Recommendation, she repeatedly reported symptom control. (R. at 187.) It appears she continued this prescription through December 2020, when she reported the medication was no longer controlling her symptoms. (R. at 187, 668-69, 681.)

friends, babysitting and engaging in outdoor activities. (R. at 286.) She reported dropping off and picking up her brother from school, doing household chores and going out with friends. (R. at 286.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Joseph Leizer, Ph.D., a state agency psychologist; Howard S. Leizer, Ph.D., a state agency psychologist; William A. Davis Clinic, ("William Davis Clinic"); Wellmont Medical Associates; and Melinda M. Fields, Ph.D., a licensed psychologist.

On February 4, 2010, while in the ninth grade, a psychological evaluation was performed to determine if McCray required special education or related services. (R. at 262-67.) McCray struggled in the areas of math and language arts, and she had difficulty following directions. (R. at 262.) The Wechsler Adult Intelligence Scale – Third Edition, ("WAIS-III"), was administered, and McCray obtained a verbal IQ score of 82 ±3, a performance IQ score of 69 ±4 and a full-scale IQ score of 74 ±3. (R. at 263.) The Woodcock-Johnson Tests of Achievement – Third Edition, ("WJ-III"),[5] was administered, and McCray's results ranged from intellectually disabled to average. (R. at 264-65.) The Bender Visual-Motor Gestalt Test – Second Edition, ("BG-II"), showed McCray's visual-motor coordination skills fell within the lower limits of the average range, but were appropriately developed. (R. at 266.) McCray demonstrated low average visual memory. (R. at 266.) Observation reports indicate that McCray stayed on task, followed directions and did not interact with other students. (R. at 253, 257.) Although McCray struggled with academic requirements,

---

[5] The WJ-III test is an intelligence test series designed to measure general intellectual ability, as well as academic achievement, scholastic aptitude, cognitive abilities and oral language. *See* tests.com/Woodcock-Johnson-Testing (last visited Apr. 26, 2023.)

she did not meet the guidelines for placement in special education, and she graduated high school in 2012 with a standard diploma. (R. at 244, 254.)

From March 2018 to December 2020, McCray received mental health treatment and medication management at the William Davis Clinic. McCray reported she experienced flashbacks related to a 2009 motor vehicle accident, and she avoided driving on the interstate. (R. at 335.) McCray denied suicide attempts, self-injurious behavior and being hospitalized for psychiatric treatment. (R. at 336.) She was prescribed Wellbutrin in March 2018. (R. at 360.) McCray was diagnosed with generalized anxiety disorder; borderline intellectual functioning; social phobia, generalized; and major depressive disorder, recurrent, in full remission. (R. at 341.)

In 2018, McCray saw Emily C. Steffey-Stacy, P.M.H.N.P., a professional mental health nurse practitioner with the William Davis Clinic, on three occasions. (R. at 276-85, 335-44, 362-70.) Examinations showed that McCray's speech was normal; her thought process was intact; she had appropriate judgment and fair insight; she was fully oriented; her recent and remote memory were intact; her attention span and concentration were good; her mood ranged from "ok" to "pretty good" with a pleasantly interactive affect; and she denied suicidal and homicidal ideations and hallucinations. (R. at 280, 341, 367.) Her Patient Health Questionnaire-9, ("PHQ-9"), scores[6] ranged from four to seven, indicating minimal to mild

---

[6] The PHQ-9 is a multipurpose instrument for screening, diagnosing, monitoring and measuring the severity of depression. A PHQ-9 score of zero to four indicates none to minimal symptoms; a score of five to nine indicates mild depression; a score of 10 to 14 represents moderate depression; a score of 15 to 19 indicates moderately severe depression; and a score of 20 to 27 indicates severe depression. *See* https://www.hiv.uw.edu/page/mental-health-screening/phq-9 (last visited Apr. 26, 2023).

depression. (R. at 281, 342, 368.) McCray scored a seven on the anxiety scale,[7] indicating mild symptoms. (R. at 281-82.) McCray reported that she was doing well on her medication regimen, and Steffey-Stacy noted McCray's symptoms were stable. (R. at 276, 335.) McCray reported she had an apartment and was living on her own, and her depression caused no difficulty in working, caring for her home or getting along with others. (R. at 362.) McCray stated she planned to work with the Department of Aging and Rehabilitative Services, ("DARS"), for vocational rehabilitation training. (R. at 335, 362.)

In 2019, McCray saw Steffey-Stacy on four occasions. (R. at 371-88, 390-94, 413-28.) Examinations showed that McCray's speech was normal; her thought process was intact; she had mildly impaired judgment and fair insight; she was fully oriented; her recent and remote memory were intact; her attention span and concentration were good; her mood was described as "ok," "pretty good" and "mellow, content, pretty much good" with a pleasantly interactive affect; and she denied suicidal and homicidal ideations and hallucinations. (R. at 375, 384, 417, 425.) Her PHQ-9 scores ranged from four to five, indicating minimal to mild depression. (R. at 376, 385, 418, 426.) McCray scored a three, four and seven on the anxiety scale, indicating minimal to mild symptoms. (R. at 376-77, 385-86, 418-19, 426-27.) McCray reported that she was doing well on her medication regimen.[8] (R.

---

[7] When screening for anxiety disorder, a score of eight or greater represents a reasonable cut-point for identifying probable cases of generalized anxiety disorder. The following cut-offs correlate with the level of anxiety severity: Score 0-4: minimal anxiety; Score 5-9: mild anxiety; Score 10-14: Moderate anxiety; and a Score greater than 15: severe anxiety. See https://www.hiv.uw.edu/page/mental-health-screening/gad-7 (last visited Apr. 25, 2023.)

[8] In January 2019, McCray reported she experienced crying spells correlating with her menstrual cycle. (R. at 380.) McCray's grandfather was present at this appointment and expressed concerns that McCray did not take responsibility for paying her bills and other activities of daily living. (R. at 380.)

at 371, 380, 413, 421.) She reported spending time at Douglas Lake with her family. (R. at 413.) McCray stated she had not followed up with DARS and, despite being encouraged to do so, she stated she had no interest in doing so. (R. at 371, 380, 413.)

On September 11 and 25, 2019, February 5, 2020, and August 31, 2020, Dr. Nicholas A. Cook, M.D., a physician with Wellmont Medical Associates, noted that McCray was screened for depression, and her PHQ-9 score was zero; thus, no follow-up treatment for depression was recommended. (R. at 540-48, 704-08.)

In 2020, McCray saw Steffey-Stacy on three occasions. (R. at 429-36, 639-46, 681-88.) Examinations showed that McCray's speech was normal; her thought process was intact; she had fair judgment and insight; she was fully oriented; her recent and remote memory were intact; her attention span and concentration were good; her mood was described as "doing good," anxious and irritable, with a pleasantly interactive affect; and she denied suicidal and homicidal ideations and hallucinations. (R. at 433, 643, 685.) Her PHQ-9 scores were eight, 10 and 12, indicating mild to moderate depression. (R. at 434, 644, 686.) McCray scored a seven and 13 on the anxiety scale, indicating mild to moderate symptoms. (R. at 434, 644, 686-87.) McCray reported that she was doing well on her medication regimen, but in December 2020, she reported Wellbutrin was not helping her symptoms, and she reported anger and irritability.[9] (R. at 429, 639, 681.) Steffey-Stacy advised McCray to continue therapy and Wellbutrin, and she also prescribed Lamictal for mood. (R. at 687.)

---

[9] In February 2020, McCray reported irritability correlating with her menstrual cycle. (R. at 429.)

In 2020, McCray saw Katherine Burner Barnett, L.C.S.W., a licensed clinical social worker with the William Davis Clinic, on three occasions for individual counseling to address depression, anxiety, social phobia and borderline intellectual functioning. (R. at 647-58.) In May 2020, McCray reported she experienced anxiety while at Walmart, stating she felt impatient and agitated with a man who was moving slowly in the parking lot. (R. at 652.) In June 2020, McCray reported increased irritability and stated she "got into a honking war" while at Walmart after someone blocked her from backing out of a parking space. (R. at 639.) In July 2020, McCray reported some irritation, but stated she was able to manage it. (R. at 655.) McCray's mood was described as anxious and down and "a little worried and down but okay;" her behavior was congruent with mood and situation; she had normal eye contact and speech; her judgment was normal, but she had limited insight; she was fully oriented; and she denied suicidal and homicidal ideations, hallucinations, delusions and paranoia. (R. at 649, 653, 656.) McCray scored eight and 10 on the PHQ-9, indicating mild to moderate symptoms. (R. at 644, 650.) She scored nine and 13 on the anxiety scale, indicating mild to moderate symptoms. (R. at 644, 651.) Barnett diagnosed generalized anxiety disorder; borderline intellectual functioning; social phobia, generalized; and major depressive disorder, recurrent, moderate. (R. at 650.)

On March 2, 2020, Joseph Leizer, Ph.D., a state agency psychologist, ("J. Leizer"), completed a Psychiatric Review Technique form, ("PRTF"), finding McCray had mild limitations in her ability to understand, remember and apply information and to adapt or manage herself and moderate limitations in her ability to interact with others and to concentrate, persist or maintain pace. (R. at 62-63.) He noted he based his findings on McCray's diagnoses of depression and anxiety with limitations in social interactions and concentration. (R. at 63.)

J. Leizer also completed a mental assessment, finding McCray had moderate[10] limitations in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual withing customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 64-66.) J. Leizer stated McCray's work-related mental abilities were, otherwise, not significantly limited. (R. at 64-65.) J. Leizer noted that the updated evidence did not significantly differ from the evidence at the time of the ALJ's October 2018 decision. (R. at 66.)

On June 2, 2020, Howard S. Leizer, Ph.D., a state agency psychologist, ("H. Leizer"), completed a PRTF, finding McCray had moderate limitations in her ability to understand, remember and apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage herself. (R. at 75-76.) H. Leizer found that, due to McCray's diagnosis of borderline intellectual functioning, she would be limited in her ability to understand and carry out complex tasks. (R. at 76.) He opined that McCray's anxiety and depression would limit her social and adaptive functioning. (R. at 76.)

---

[10] The regulations define "moderate limitations" as those resulting in a fair ability to function independently, appropriately, effectively and on a sustained basis. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (2022).

H. Leizer also completed a mental assessment, finding McCray had moderate limitations in her ability to understand and remember detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual withing customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. (R. at 77-80.) H. Leizer stated McCray's work-related mental abilities were, otherwise, not significantly limited. (R. at 78-79.) H. Leizer noted that McCray could understand, remember and carry out short and simple instructions; she could perform activities within a schedule and maintain attendance with only occasional problems expected up to two times per month; she could occasionally work in close proximity to others; she could complete a normal workday/workweek; and she could perform simple, routine tasks at a consistent pace with others. (R. at 78-79.)

On January 6, 2021, Melinda M. Fields, Ph.D., a licensed psychologist, evaluated McCray. (R. at 860-66.) McCray denied involvement in inpatient psychiatric/psychological treatment. (R. at 861.) She stated she spent her time at home "laying around and watching movies." (R. at 863.) McCray reported that she was responsible for her hygiene and household chores and that her grandparents managed her finances and completed her paperwork. (R. at 863.) McCray had good hygiene and grooming; she was pleasant and cooperative; she had adequate eye contact; she was fully oriented; she provided responses to direct inquiries in a relevant and coherent fashion; her mood was anxious, and she displayed hand

tremors; her affect was congruent to mood; her stream of thought was organized and logical; she exhibited no evidence of a thought content impairment or perceptual disturbances; her judgment was impaired, as evidenced by responses to presented scenarios; her immediate memory was normal; her recent recall was impaired, as she could recite only one of four words after a delay; her concentration was impaired; and her pace was normal. (R. at 863.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and McCray obtained a full-scale IQ score of 72, placing her in the borderline range of intellectual functioning. (R. at 863-64.) The Beck Depression Inventory, ("BDI"), and the Beck Anxiety Inventory, ("BAI"), were indicative of severe depressive and anxiety-related symptomatology. (R. at 865.) Fields diagnosed unspecified bipolar and related disorder; panic disorder; and borderline intellectual functioning. (R. at 865.)

That same day, Fields completed a mental assessment, finding McCray had marked limitations, resulting in an unsatisfactory work performance, in her ability to deal with the public; to use judgment in public; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out detailed and complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 857-59.) Fields opined that McCray retained at least a satisfactory ability to make all other occupational, performance and personal/social adjustments. (R. at 857-58.) Fields found McCray would be absent from work more than two days a month. (R. at 859.) Fields based these findings on McCray's panic attacks; borderline intellectual functioning; impaired judgment, concentration and recent and remote recall; bi-polar-related symptoms; and impaired social functioning. (R. at 857-59.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2022). *See also Heckler v. Campbell,* 461 U.S. 458, 460-62 (1983); *Hall v. Harris,* 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2022).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano,* 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In

determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439-40 (4th Cir. 1997).

McCray filed her application in November 2019; thus, 20 C.F.R. § 416.920c governs how the ALJ considered the medical opinions here.[11] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. § 416.920c(a) (2022). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 416.920c(b), (c)(1)-(5) (2022) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 416.920c(b)(1) (2022).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his

---

[11] 20 C.F.R. § 416.920c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

decision. *See* 20 C.F.R. § 416.920c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(1) (2022). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(2) (2022). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[12] *See* 20 C.F.R. § 416.920c(b)(2).

McCray argues the ALJ erred by improperly determining her residual functional capacity by rejecting Fields's opinion. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) McCray argues the ALJ erred by relying on the state agency consultants' assessments, which she contends were "stale [and] outdated." (Plaintiff's Brief at 5.)

The ALJ is not required to adopt a residual functional capacity assessment of a treating or examining physician in determining a claimant's residual functional capacity. Instead, the ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. § 416.946(c) (2022); *see also* 20 C.F.R. § 416.927(d)(2) (2022) (a claimant's residual functional capacity is an issue reserved

---

[12] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 416.920c(b)(3) (2022).

exclusively to the Commissioner). The relevant question is whether the ALJ's residual functional capacity assessment is based upon all the relevant evidence, including medical records, medical source opinions and the claimant's subjective allegations and description of her own limitations. *See* 20 C.F.R. § 416.945 (2022).

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 416.945(a). The ALJ found McCray had the residual functional capacity to perform light work, except she was limited to simple, routine work with no complex instructions, procedures or processes; she required a stable, low-stress work environment with few changes and free of timed performance demands; she could occasionally interact with co-workers or supervisors; and she could only have infrequent (less than occasional) interaction with the public. (R. at 20.)

In making this residual functional capacity finding, the ALJ stated he found H. Leizer's opinion that McCray had moderate limitations in all domains of functioning persuasive and consistent with the medical evidence. (R. at 22.) H. Leizer found that, due to McCray's diagnosis of borderline intellectual functioning, she would be limited in her ability to understand and carry out complex tasks. He further found that McCray's anxiety and depression would limit her social and adaptive functioning. The ALJ noted the medical evidence generally showed intact memory and concentration; an anxious and depressed mood; poor control of anger and irritability; social isolation; and a full-scale IQ score of 72. (R. at 22.)

The ALJ found J. Leizer's finding of moderate limitations in interacting with others and maintaining concentration persuasive because the medical evidence was more consistent with moderate limitations in all domains. (R. at 22.) Thus, the ALJ

further found J. Leizer's finding of mild limitations in memory and managing herself unpersuasive. (R. at 22.)

The ALJ noted Fields found McCray had marked limitations in all domains of mental functioning and would be absent from work more than two days a month. (R. at 22.) Fields based these findings on McCray's panic attacks, borderline intellectual functioning, impaired judgment and concentration and recent and remote recall, bi-polar-related symptoms and impaired social functioning. The ALJ found Fields's opinion unpersuasive and inconsistent with the medical evidence, which documented no mental health hospitalizations, generally intact memory and concentration, an anxious and depressed mood, and a full-scale IQ score of 72. (R. at 22.) The ALJ noted that McCray's BDI and BAI were indicative of severe depressive and anxiety-related symptomatology. (R. at 21.) The record shows that, throughout 2018 and 2019, McCray's mental status examinations showed her PHQ-9 scores ranged from zero to seven, indicating minimal to mild depression, and her scores ranged from three to seven on the anxiety scale, indicating minimal to mild symptoms.

Throughout 2020, McCray's mental status examinations showed her PHQ-9 scores ranged from seven to 12, indicating mild to moderate depression, and her scores ranged from seven to 13 on the anxiety scale, indicating mild to moderate symptoms. Despite these increased scores, her examinations in 2020, showed that McCray had normal eye contact and speech; her thought process was intact; she was fully oriented; her recent and remote memory were intact; her attention span and concentration were good; her judgment was normal or fair; and her insight was from fair to limited. Although McCray reported irritability, she stated she was able to manage it. In fact, prior to December 2020, McCray consistently reported that she

was doing well on her medication regimen, and Steffey-Stacy noted McCray's symptoms were stable. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). In December 2020, McCray was advised to continue therapy[13] and Wellbutrin, and she was prescribed Lamictal for her mood.

The ALJ also considered McCray's full-scale IQ score of 72, as reported in 2021, suggesting borderline range of intellectual functioning, which he accounted for by limiting McCray to simple, routine work with no complex instructions, procedures or processes. (R. at 20.) These same limitations accommodate McCray's difficulty focusing, concentrating and understanding detailed or complex instructions. (R. at 20.) To the extent that McCray was sometimes angry and irritable around others and anxious in crowds or around the public, the ALJ limited her to no more than occasional interaction with co-workers and supervisors and infrequent contact with the public. (R. at 20.) Likewise, to account for McCray's ongoing anxiety, the ALJ limited her to a stable work environment and to work that was low-stress, undemanding with no time to performance demands. (R. at 20.) Based on this, I find substantial evidence exists to support the ALJ's consideration of the medical evidence and his residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the medical evidence;

---

[13] McCray participated in three individual counseling sessions with Barnett.

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that McCray was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny McCray's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion

of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:	June 2, 2023.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE